IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TERRY LYNN MOYERS | ) | |
| | ) | |
| v. | ) | No. 3:13-0959 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
|     Acting Commissioner of | ) | |
|     Social Security | ) | |

To: The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 28) should be GRANTED to the extent that the case should be REMANDED to the ALJ for further consideration.

## I. INTRODUCTION

On August 6, 2009, the plaintiff filed for SSI and DIB, alleging a disability onset date of November 1, 2006, due to bipolar disorder, antisocial personality disorder, and "back problems."

(Tr. 12, 242-54, 329, 334.)[1] His applications were denied initially and upon reconsideration. (Tr. 12, 131-36, 144-50.) On March 20, 2012, the plaintiff appeared via video teleconference and testified at a hearing before Administrative Law Judge Mary Montanus ("ALJ") (tr. 80-120), and amended his alleged disability onset date to December 31, 2010. (Tr. 84.) A subsequent hearing was held before the ALJ on May 11, 2012, at which the plaintiff also appeared and testified via video teleconference. (Tr. 39-79.) The ALJ entered an unfavorable decision on May 18, 2012. (Tr. 12-24.) On July 18, 2013, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. BACKGROUND

The plaintiff was born on August 4, 1976, and he was 34 years old as of his amended alleged disability onset date. (Tr. 89.) He attended school through the seventh grade, obtained a GED, and has worked primarily as an auto mechanic. (Tr. 89-92, 283.)

### A. Chronological Background: Procedural Developments and Medical Records

### 1. Mental Impairments

The plaintiff has a history of mental health treatment for substance abuse, depression, bipolar disorder, and antisocial personality disorder. (Tr. 580-82, 586-621, 648-81, 803-91, 1012-81, 1094-1102, 1185-88, 1654-1715.) In September 1997, he was seen at the Mental Health Cooperative

---

[1]The plaintiff previously filed an application for SSI on June 28, 2007, which is also included in the record. (Tr. 268-73.)

("MHC")[2] after he stabbed himself in the chest with a pocket knife during an argument with his wife. (Tr. 1656.) The plaintiff denied that he was trying to hurt himself, but his wife reported that he had attempted suicide four times in the previous two years. (Tr. 1656-57.) He was hospitalized in a psychiatric unit. (Tr. 1656-58.) His next contact with MHC was in March 2000 when he requested treatment for depression and substance abuse. (Tr. 1658-59.) He did not return to MHC until September 2000 (tr. 1660-63) when he was "referred by Family and Children's Services for a recent domestic abuse charge." (Tr. 1664.) In October 2000, he was diagnosed with bipolar affective disorder, mixed without psychosis; polysubstance abuse (cannabis and benzodiazepines); and given a "rule out" diagnosis of antisocial personality disorder. (Tr. 1667.) He was assigned a Global Assessment of Functioning ("GAF") score of 50.[3] *Id.*

During his treatment at MHC, he was variously prescribed Zyprexa, Neurontin, Paxil, BuSpar, Risperdal, and Klonopin. (Tr. 1667, 1669, 1685, 1697, 1708.) Treatment notes indicate that he often reported that he was not taking his medications as prescribed and not attending clinic appointments because he did not want to wait at the clinic or had to work. (Tr. 1673-83, 1687-92,

---

[2] The records from MHC have been included in a supplemental record filed in this case (Docket Entry No. 38) but were not in the record before the ALJ. *See* Docket Entry Nos. 24, 34, 35. Because the MHC records were not considered by the ALJ, the Court has not considered them as part of its substantial evidence review. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). However, as set out in more detail below, the Court has considered the records in determining whether remand is appropriate under sentence six of 42 U.S.C. § 405(g) for new and material evidence.

[3] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 41 and 50 falls within the range of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

1699, 1701, 1703-04, 1706.) On October 22, 2002, the plaintiff was referred for crisis intake, reporting that he was depressed, having trouble controlling his temper, having trouble sleeping, and having recurrent crying spells. (Tr. 1708-10.) He reported that he had lost custody of his children and was taking Valium without a prescription. (Tr. 1708.) The plaintiff's last contact with MHC was the following day, and he was discharged in December 2002 after MHC was unable to contact him. (Tr. 1711-14.)

From December 2001 until February 2002, the plaintiff attended a court-ordered outpatient substance abuse rehabilitation program. (Tr. 580-82, 586-621, 648-81.) Following a psychiatric evaluation, he was assigned a GAF score of 50 and diagnosed with marijuana dependence, polysubstance abuse, dysthymia, major depressive disorder, intermittent explosive disorder, and antisocial personality disorder. (Tr. 664.) He was discharged on February 11, 2002, having "met and exceeded his treatment goals." (Tr. 619.)

After discontinuing contact with MHC, the plaintiff received mental health treatment (along with primary care treatment for his physical problems) at Vanderbilt University Medical Center's Vine Hill Community Clinic ("Vine Hill"). (Tr. 803-91, 1012-81, 1185-88.) Between October 2002 and November 2006, the plaintiff was treated at Vine Hill for depression/anxiety, bipolar disorder, and antisocial personality disorder primarily under the care Alison Cohen, a family nurse practitioner ("FNP"). (Tr. 805-22, 1025-27, 1032-49, 1051-56, 1058-59, 1068-70, 1073-74, 1077-79.) Ms. Cohen prescribed Zyprexa (tr. 1070), which the plaintiff stopped taking after one week because it was not helpful (tr. 1053, 1055, 1068-69), and later, Seroquel. (Tr. 1052.) The plaintiff continued to take Seroquel, and Ms. Cohen adjusted his prescribed dosage and frequently advised him to seek a mental health provider. (Tr. 805-22, 1025-27, 1032-43.) However, although the plaintiff

4

scheduled appointments with a psychiatrist and another mental health care provider, he did not receive mental health treatment outside of the treatment provided at Vine Hill. (Tr. 805-22, 1026-27, 1032-33.) In April 2006, the plaintiff reported that he "hate[d] doctors" and "[did not] want to discuss [his] mental problems and repeat the same stuff over and over again." (Tr. 809.) At that visit, he also reported that he was "feeling better on . . . Seroquel." *Id.* In November 2006, Ms. Cohen noted that, although the plaintiff was "not under care of mental health," Seroquel was "effective" and "controll[ed] his mood swings and flashbacks." (Tr. 805.)

In January 2007, Anne Williford, FNP, replaced Ms. Cohen as the plaintiff's primary care provider at Vine Hill. (Tr. 803-04.) Ms. Williford's treatment notes focus primarily on the plaintiff's physical impairments, and while it appears that the plaintiff continued taking Seroquel for some period of time, Ms. Williford apparently stopped prescribing it to him. (Tr. 803-04, 825-26, 1185-88, 1222-33.) In December 2007, Ms. Williford noted that the plaintiff "ha[d] not been under the care of mental health in over a year," was "managing very well," and "ha[d] not had violent outbursts lately [*sic*]." (Tr. 1186.)

In September and October 2010, the plaintiff underwent a consultative psychological assessment with David Terrell, Ph.D., and James Michael Scott, a Senior Licensed Psychological Examiner ("SLPE"). (Tr. 1485-99.) The examiners described the plaintiff as "extremely tense, alienated, and obsessed with physical complaints" and noted that he had "considerable and long-term difficulties with anger and anxiety." (Tr. 1485.) The plaintiff recounted a childhood filled with emotional and physical abuse and trauma, and he reported that he withdrew from school in the seventh grade at the age of 13 or 14. (Tr. 1486-87.) He reported having suicidal thoughts when he was 5 to 6 years olds and indicated that he had attempted suicide in the past and had current suicidal

ideation. (Tr. 1489.) The plaintiff related that he started working as a roofing assistant at the age of 13 or 14 and learned the trade of a mechanic at age fourteen. (Tr. 1487.) He indicated that "[a]ll of his jobs ended after he experienced recurring physical fights with male coworkers and male employers." *Id.* He also reported having "ongoing rage episodes in which he destroy[ed] objects or . . . thrust[] his fists into walls and doors in anger" resulting in "a high number of repetitive injuries and strains to his hands, fingers, shoulders, upper and lower back, and recurring high blood pressure and stomach distress." *Id.* He reported that he had five children from a prior marriage but that his parental rights to visit and communicate with the children had been taken away due to "episodes of uncontrolled rage . . . and reported domestic abuse incidents." (Tr. 1488.) He said that he had a past history of drug use including marijuana, alcohol, cocaine, morphine, Lortab, Methadone, Percocet, Soma, Klonopin, Valium, and Xanax. (Tr. 1489.) He said that he currently used marijuana 1-2 times a week but denied other drug use. *Id.*

The plaintiff was given the Wechsler Adult Intelligence Scale, Fourth Revision ("WAIS-IV"), and his results "produced clear evidence of basic Low Average intellectual functioning, corresponding to the IQ range 80-89." (Tr. 1490.) He was also given the Wide Range Achievement Test, Fourth Edition ("WRAT-IV"), and obtained grade equivalent scores of 5.4 for word reading, 8.1 for sentence comprehension, 3.1 for spelling, and 8.7 for math computation. (Tr. 1490-91.)

Dr. Terrell and Mr. Scott assigned the plaintiff a GAF score of 48 and diagnosed him with depressive disorder, not otherwise specified ("NOS"); general anxiety disorder; cannabis dependence; impulse control disorder, NOS, with recurring transient episodes of intermittent explosive disorder; eating disorder, NOS; antisocial personality disorder with borderline personality traits; and disorder of written expression. (Tr. 1496-97.) They opined that he had moderate

6

limitations maintaining attention for extended periods of two hour segments and working in coordination with or proximity to others without being unduly distracted by them. (Tr. 1498.) They also opined that he had marked limitations in his abilities to: (1) accept instructions and respond appropriately to criticism from supervisors; (2) get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes; and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 1498-99.)

### 2. Physical Impairments

The plaintiff frequently presented to emergency rooms and other health care providers with complaints of pain in his neck, shoulders, back, hands, wrists, legs, knees, ankles, and feet, often as the result of accidental or otherwise traumatic injuries. (Tr. 577-78, 583-85, 622-40, 642-43, 682-705, 737-891, 918-77, 1012-93, 1103-34, 1183-1274, 1339-51, 1359-67, 1416-25, 1435-74, 1524-1653.) He received treatment since at least 2002 at Vine Hill for a number of physical impairments including chronic neck, back, and knee pain. (Tr. 803-91, 918-41, 1012-81, 1183-1209, 1222-36.) X-rays of his pelvis and cervical, thoracic, and lumbar spines taken after a car accident in May 2003 were negative. (Tr. 638-40.) In August 2004, he suffered a hand crush injury in which he fractured the fourth and fifth fingers on his right hand. (Tr. 684-99, 850-52.) Subsequent x-rays of his right hand and wrist in 2006 and 2010 were normal. (Tr. 774-75, 1418.)

Following an MRI in April 2005, he was diagnosed with degenerative disc disease of the lumbar spine. (Tr. 1023-24, 1033-34.) He was treated at Vine Hill for chronic pain management, primarily with Lortab and Methadone, and was described in July 2007 as "functional" and able to

"perform his job as a mechanic" when taking these medications. (Tr. 919-20, 935.) He had arthroscopic right knee surgery in February 2007 to repair a torn meniscus. (Tr. 918-19, 936-37.) He has had a total of four knee surgeries, two on each knee. (Tr. 625, 853, 1563.)

In February 2008, the plaintiff suffered a lower leg injury, which caused a spiral fracture of the right fibula and a coronal fracture of the tibia as well as a mildly displaced fracture of the posterior malleolus in his ankle. (Tr. 1110-11.) An MRI of his lumbar spine in November 2008 showed degenerative changes "without evidence of canal or neural foraminal stenosis." (Tr. 1221.) MRIs in March 2009 showed small disk protrusions of the lower thoracic spine and small disk herniations of the lumbar spine but otherwise showed no acute abnormality. (Tr. 1244, 1252-54.)

In April 2009, the plaintiff presented to Dr. James Ladson for pain management. (Tr. 1275-1300, 1426-34, 1524-49.) The plaintiff reported that his chronic pain started when he was 19 years old and that a combination of Lortab, Methadone, and Soma had helped. (Tr. 1426.) He explained that his back pain started when he "twisted his low back while lifting," his leg pain had persisted after he broke his leg, and his shoulder pain was not traumatic in origin but had started a month earlier. *Id.* In May and June 2009, Dr. Ladson administered a series of lumbar epidural steroid injections. (Tr. 1287-89.)

In September 2009, Dr. Ladson diagnosed the plaintiff with carpal tunnel syndrome in his right hand after observing abnormalities in an electromyogram and nerve conduction study. (Tr. 1433.) In November 2009, the plaintiff was evaluated by Dr. Michael Schlosser, a neurologist, and reported having neck, back, and right arm pain radiating into his hand and fingers. (Tr. 1352.) Upon examination he had full strength in his upper extremities except that his right hand grip was 4+/5 with decreased sensation in his right arm. *Id.*

A December 2009 cervical spine MRI showed a disc osteophyte complex at C3-C4 causing "mild to moderate left neuroforaminal narrowing" with no central canal stenosis. (Tr. 1353-54, 1361, 1367.) An x-ray of his left shoulder at that time was normal (tr. 1351); however, the plaintiff soon injured his left shoulder while pushing a truck, resulting in a non-displaced fracture of the greater tuberosity and a torn rotator cuff. (Tr. 1353, 1359-60, 1365-66.)

On February 24, 2010, Dr. Marc Watson performed a consultative examination and completed a medical assessment of the plaintiff's physical ability to do work-related activities. (Tr. 1386-91.) Upon physical examination, the plaintiff had a positive straight-leg raise test and decreased sensation to light touch and pinprick in the right leg, and he had decreased back and left shoulder range of motion. (Tr. 1391.) Otherwise, he had full range of motion in his cervical spine, right shoulder, elbows, wrists, hands, hips, knees, and ankles, and he had normal gait, normal deep tendon reflexes, and normal muscle strength. *Id.* Dr. Watson opined that the plaintiff could lift and/or carry ten pounds occasionally and that, in an eight-hour workday, he could stand and/or walk at least two hours and sit about six hours. (Tr. 1386-87, 1391.)

On March 23, 2010, Dr. Nathaniel Robinson, a nonexamining DDS medical consultant, completed a physical Residual Functional Capacity ("RFC") assessment. (Tr. 1407-15.) Dr. Robinson opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 1408.) Dr. Robinson opined that the plaintiff was limited in his left upper extremity to frequent pushing and/or pulling and reaching in all directions and was limited to frequent postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 1408-10.) Dr. Robinson opined that the limitations identified by Dr. Watson were

"clearly too strict and . . . not consistent with the [medical evidence of record] in file or [Dr. Watson's] own exam." (Tr. 1413.)

In April and May 2010, the plaintiff returned to Dr. Ladson with complaints of pain in his neck, back, and left arm and was prescribed Lortab and Soma. (Tr. 1525-32.) In June 2010, he presented to Dr. Larry Mitchell at Mount Juliet Spine and Pain Management and was diagnosed with, *inter alia*, degenerative disc disease of the cervical, lumbar, and thoracic spine; cervical radiculopathy; cervicalgia; brachial neuritis; lumbago; lumbar facet syndrome; and thoracalgia. (Tr. 1446-74, 1550-56.) He was treated with a series of medial branch nerve blocks and facet injections in his spine as well as trigger point injections in his right shoulder. (Tr. 1449-60, 1553.) He was discharged from treatment in August 2010 after being "verbally disruptive." (Tr. 1554.)

On November 6, 2010, Dr. Michael Ryan, a nonexamining DDS medical consultant, completed a physical RFC assessment. (Tr. 1515-23.) Dr. Ryan's RFC assessment matched Dr. Robinson's except that he further found the plaintiff capable of only occasional climbing of ladders, ropes, or scaffolds and only frequent fingering and handling with his right hand due to carpal tunnel syndrome. (Tr. 1517-18.)

An MRI of the plaintiff's right knee in January 2011 showed a meniscal tear, and a left shoulder MRI showed a healing fracture, improved edema, and tendinopathy with partial tears of the supraspinatus and infraspinatus muscles. (Tr. 1573-75.)

From October 2011 to February 2012, the plaintiff received treatment at Madison Family Clinic for hypertension, back pain, knee pain, and headaches and was prescribed Lortab, Soma, Remeron, propranolol, and diclofenac sodium. (Tr. 1557-71.) Physical exams in January 2012 showed that the plaintiff had thoracic and lumbar spine tenderness with mildly reduced range of

motion, right and left knee tenderness with full range of motion, and full range of motion in his shoulders, elbows, hips, and ankles.  (Tr. 1564, 1567.)   In February 2012, the plaintiff presented with back pain, which he reported was a 7/10, and upon physical examination, it was noted that he had "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection."  (Tr. 1570.)

## B. Hearing Testimony

The plaintiff's initial hearing was held on March 20, 2012, with a subsequent hearing on May 11, 2012.  (Tr. 39-120.)  At both hearings, the plaintiff was represented by counsel and testified via video teleconference, and Walter Todorowski, a vocational expert ("VE"), also testified.[4]  *Id.* At the first hearing, the plaintiff testified that he attended school through the seventh grade and obtained a GED.  (Tr. 89.)  He testified that he has worked in construction and at fast food restaurants and factories but that he has primarily worked as an auto mechanic.  (Tr. 89-92.)

The plaintiff testified that he is unable to work due to knee problems, back problems, bipolar disorder, and antisocial personality disorder.  (Tr. 96.)  He said that he also has carpal tunnel syndrome in his hands, which causes his hands to go numb and makes it difficult to grip certain items.  (Tr. 105.)  Additionally, he related that he has tendonitis and bone spurs in both shoulders and that he broke his left shoulder a year earlier and cannot lift his arms over his head.  (Tr. 98-99.) He testified that, after he works a few days in a week, his legs, neck, and back become stiff and painful.  (Tr. 105.)  He testified that he takes pain medication but is sometimes unable to afford his medication and goes without it.  (Tr. 102-03.)

---

[4] The ALJ and the VE were in Orlando, Florida for both hearings.  (Tr. 41, 82.)

The plaintiff testified that he last received mental health treatment in 2006-2007 but that the medication he was taking "made [him] a lot worse." (Tr. 97.) He said that he "wasn't going to be a guinea pig to their experimental drugs" and explained that, "I found if I isolate myself from others, I don't have quite as many problems." *Id.* He testified that he sleeps on a friend's couch but that he tries to come and go when no one is around so that he does not "have [a] confrontation with anybody." (Tr. 96-97.) He explained that when he is not working he reads the Bible in his truck, sits in parking lots, and does "anything just to isolate [himself] from others." (Tr. 97.) He testified that he has been "discharged" from "[j]ust about every job" he has had due to verbal or physical altercations, and he estimated that he has been in "[w]ell over 100" physical altercations in his life, adding that "[t]here's too many to count." (Tr. 100, 103.)

The plaintiff testified that he has worked as a self-employed auto mechanic for the past 3-4 years but that he has been doing "small jobs" such as "brake jobs, alternator jobs, [and] oil changes" because he cannot "do the jobs [he] used to be able to do because [he] can't do all the heavy lifting." (Tr. 92-94.) He said that he works "at the very most 20 hours a week" if he is "trying to really push [himself]" and that he works with an assistant who helps him with heavier jobs that he is unable to do. (Tr. 95, 99, 105-06.) He said that he keeps an invoice book and gets business through "word of mouth." (Tr. 95.) He testified that "sometimes" he is able to get along with his customers and "sometimes not so much." (Tr. 96.) He said that whether he gets along with his customers "depends on their mentality with [him] and . . . their attitude." *Id.* He said that he does not negotiate his prices with customers but that he states his price and the customer can either take it or leave it. *Id.* He estimated that he gets hired for a job approximately 30% of the time that he interacts with potential

customers. (Tr. 100-01.) He explained that, once hired, his interaction with the customer is limited to "telling them what parts they need" and receiving payment. (Tr. 101.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and classified the plaintiff's past job as an auto mechanic as medium, skilled work. (Tr. 111, 113.) The ALJ asked the VE whether a hypothetical person with the plaintiff's age, education, and work experience would be able to obtain work if he could perform a limited range of light work; could lift up to twenty pounds occasionally and ten pounds frequently; could stand and walk for four hours in an eight-hour workday and for one hour at a time before needing to alternate to a sitting position while on task for approximately ten minutes; could sit for six hours in an eight-hour workday; could not perform overhead work with the left upper extremity but could perform occasional overhead work with the right upper extremity; could frequently handle or finger with the right upper extremity; could occasionally stoop, crouch, kneel, climb stairs, and balance; could not climb ladders, ropes, or scaffolds; could not work at heights or with dangerous moving machinery; needed to avoid excessive vibration; was limited to tasks that were routine and included one to three steps; was limited to two hour periods of concentration at a time; and could have only occasional and superficial interaction with the general public, coworkers, and supervisors. (Tr. 111-12.)

The VE replied that such a person could not perform the plaintiff's past relevant work but could perform sedentary, unskilled jobs including: (1) final assembler of optical goods, DOT code 713.687-018, with 30,580 jobs available in the national economy; (2) film hand mounter, DOT code 976.684-018, with 20,180 jobs available in the national economy; and (3) eye-dropper assembler,

13

DOT code 739.687-086, with 23,955 jobs available in the national economy.[5]  (Tr. 112-13.)  The VE characterized these jobs as "bench assembly type jobs" that did not require interaction with the general public.  (Tr. 113.)

Next, the ALJ asked whether a person with these limitations, who was further reduced to a range of sedentary work rather than light work, would be able to perform these jobs.  *Id.*  The VE replied that such a person could perform these jobs and explained that his answers were based on his "observation of these jobs in various work settings."  *Id.*  In response to questioning by the plaintiff's attorney, the VE testified that these jobs would not be available to a person who had marked limitations in his abilities to: (1) accept instructions and respond appropriately to criticism from supervisors; (2) get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes; and (3) complete a normal work day and work week without interruptions from psychologically based symptoms.  (Tr. 114.)

A supplemental hearing was held on May 11, 2012, principally for the purpose of obtaining additional VE testimony.  (Tr. 39-79.)  Upon cross-examination by the plaintiff's attorney, the VE testified that, in order to determine the number of jobs in the economy for a specific occupation, he uses a program called Oasis, which bases its numbers on the Occupational Employment Survey ("OES").  (Tr. 63, 66-68.)  The OES is a survey sent to employers in which they report how many employees they have performing specific jobs.[6]  (Tr. 444-47.)  The VE agreed that the OES is the

---

[5] The transcript shows the third job as "eye doppler assembler."  (Tr. 113.)  The Court assumes that this is an error because DOT code 739.687-086 corresponds to "eye-dropper assembler."  *See* U.S. Dep't of Labor, Dictionary of Occupational Titles 772-73 (4th ed. 1991).

[6] The plaintiff included a copy of one such survey in the record, an Occupational Employment Report of Apparel Manufacturing, which includes an entry for SOC code 51-9031, "Cutters and Trimmers, Hand."  (Tr. 444-47.)

primary basis for the numbers that are collected about jobs.  (Tr. 60, 66.)  However, the VE testified that he did not look at the OES statistics themselves but instead he looked up a job in the DOT and then used Oasis to supply him with the number of jobs available in the economy for that job.  (Tr. 63, 65.)  He testified that vocational experts rely upon Oasis and it is considered "authoritative." (Tr. 73.)  However, he acknowledged that he did not know the methodology used by Oasis, that the information he relied upon was from May 2009, and that the number of available jobs "could have" decreased since then.  (Tr. 72-73.)

The VE testified that the OES classifies jobs according to the Standard Occupational Classification System ("SOC") and that SOC classifications differ from those used in the DOT. (Tr. 60-62.)  The VE acknowledged that one cannot look up a DOT code in the SOC but that a program called ONET is used to "cross log" jobs between the DOT and SOC.  (Tr. 62.)  By way of example, the VE agreed that if one entered the DOT code for film hand mounter into ONET, "the only match that comes up is hand cutters and trimmers."  (Tr. 62.)  The SOC description for hand cutters and trimmers, SOC code 51-9031, is that they "use hand tools or handheld power tools to cut and trim a variety of manufactured items such as carpet, fabric, stone, glass, or rubber."  (Tr. 64, 447.)  The plaintiff's attorney submitted that, per the Bureau of Labor Statistics website and as of May 2011, there were 14,670 hand cutters and trimmers jobs in the national economy.  (Tr. 66-67.) The VE did not dispute nor verify this number but acknowledged that he could not be certain how many of those jobs were film hand mounter jobs because the SOC had "excluded the idea of cutting film as part of the jobs listed under that category. So, we wouldn't know."  (Tr. 67.)

Nevertheless, the VE testified that he had observed the jobs of film hand mounter and optical goods assembler in the past and knew that they still existed in the economy,[7] although he agreed that he had not personally counted the number of these specific jobs in the national economy. (Tr. 65-66, 73-74.) The plaintiff's attorney asked the VE:

Q: . . . [I]f you didn't count those numbers, and Oasis didn't count those numbers, and OES is the only entity you've got that did count the numbers, where in the world do you get 20,180 from?
A: All I know is that they based it on Occupational Employment Survey at that time. That's all I can tell you. And then they posted it on a computer. And different programs –
Q: And did you —
A: Go head [*sic*]. Different computer programs have different statistics. This is what this has.
Q: Would you find it reliable? That number, 20,180, knowing that the May 2011 OES total for all part-time, fulltime [*sic*] jobs that can be classified as hand cutter and trimmer –
A: No, I can –
Q: it's 14,670?
A: Right. I can see that there are other types of occupations within that number. Yes, I can concede that, because I know about the cutters and trimmers category that was there. Okay? Now, having said that – and I've testified truthfully in court about where the statistics come. And if they ask me, I'll tell them. And they'll ask me, "Is this inclusive or just including that type of job?" or I can see that there [*sic*] several other jobs in here? Yes. The statistics I have, they don't delineate. And I'm beginning to see, even from your information, it doesn't delineate how many carpet cutters, how many plastic cutters, how many upholstery cutters. You know, it doesn't break it down neither, nor does it give you a DOT number for those occupations. Okay? I don't know what occupations they've excluded in their survey, to say that's all that exists as far as hand cutters and trimmers. I have no way of knowing. I haven't questioned those people.
Q: Wouldn't it be fair to say that, of the 14,670 hand cutters and trimmers that were – that's the total we got from May 2011. That at best, only some percentage of that number would be the jobs that you've identified –

---

[7] The VE testified that he had observed a film lab approximately 4-5 years earlier. (Tr. 65-66, 73-74.) For the optical goods assembler job, he explained that "[I]n Daytona Beach, they have a large eyeglass factory there. You know, they put in lenses and pieces. One of the jobs I reserved [*sic*] some time ago was kind of like an eyeglass lab, let's say attached to a Pearle Vision or something like that, where they were doing grinding of lenses and fitting of glass pieces." (Tr. 74.)

A: – that's correct.  That's correct.  I've already conceded that.  Yes.
Q: And we don't know what that number would be?
A: No.  But nobody knows what that number is.
Q: And that would also be true for the other jobs you identified as well?
A: Yes.

(Tr. 76-78.)


# III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on May 18, 2012.  (Tr. 12-24.)  Based upon the record,

the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act
        through December 31, 2010.

2.      The claimant has not engaged in substantial gainful activity since
        December 31, 2010, the amended alleged onset date (20 CFR 404.1571 *et
        seq*., and 416.971 *et seq*.).

                                        ***

3.      The claimant has the following severe impairments: 1) History of
        polysubstance abuse, (2) Status post fracture of right hand fingers, wrist and
        right tibia, (3) Degenerative disc disease of the thoracic/lumbar and cervical
        spine, (4) Degenerative joint disease of the knee, status post meniscal tears,
        (5) Fracture and tears of the left shoulder, (6) Right carpal tunnel syndrome,
        (7) Obesity, and (8) Depressive disorder (20 CFR 404.1520(c) and
        416.920(c)).

                                        ***

4.      The claimant does not have an impairment or combination of impairments
        that meets or medically equals the severity of one of the listed impairments
        in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
        404.1526, 416.920(d), 416.925 and 416.926).

                                        ***

5.      After careful consideration of the entire record, the undersigned finds that the
        claimant has the residual functional capacity to perform a range of work
        between a full range of sedentary work to light work as defined in 20 CFR
        404.1567(a,b) and 416.967 (a,b).  The claimant can stand or walk for four out

of eight hours, for one hour at a time, before needing to alternate to a sitting position while on task for 10 minutes; can sit for six out of eight hours; cannot perform overhead work with the left upper extremity, and can perform only occasional overhead work with the right upper extremity, and only frequent handling and fingering with the right upper extremity (dominant); only occasional stooping, crouching, kneeling, climbing stairs, and balancing; and perform no climbing ladders, ropes or scaffolds. The claimant should avoid work at heights or around dangerous moving machinery; and excessive vibration. The claimant can perform routine tasks with one to three steps, with periods of concentration limited to two hours at a time and only occasional interaction with the general public, coworkers and supervisors.

\*\*\*

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\*\*\*

7.      The claimant was born on August 4 1976 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

\*\*\*

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-24.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to

support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is

required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his past relevant employment, the burden of production shifts in step five to the Commissioner to show that the

plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. 20 C.F.R. § 404.1512(f). *See also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The Five-Step Inquiry**

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (Tr. 14.) At step two, the ALJ determined that the plaintiff had the following severe impairments: "1) History of polysubstance abuse, (2) Status post fracture of right hand fingers, wrist and right tibia, (3) Degenerative disc disease of the thoracic/lumbar and cervical spine, (4) Degenerative joint disease of the knee, status post meniscal tears, (5) Fracture and tears of the left shoulder, (6) Right carpal tunnel syndrome, (7) Obesity, and (8) Depressive disorder." (Tr. 14-15.) At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15-17.) At step four, the ALJ determined that the plaintiff was unable to perform his past relevant work. (Tr. 22.) At step five, the ALJ found that the plaintiff could perform the representative jobs of: (1) "Final Assembler of Optical Goods; (2) "Film Can Mounter;" (3) and "Eye Doppler [*sic*] Assembler." (Tr. 22-24.) Consequently, the ALJ determined that the plaintiff had not been under a disability from December 31, 2010, through the date of the decision. (Tr. 24.)

**C. The Plaintiff's Assertions of Error**

First, the plaintiff argues that a sentence six remand under 42 U.S.C. § 405(g) is appropriate so that the ALJ can consider medical evidence that was submitted to the SSA prior to the ALJ's decision but not made a part of the record before the ALJ. Docket Entry No. 28-1, at 72. Second, the plaintiff argues that the ALJ failed to properly evaluate the opinions of Dr. Watson and

Dr. Terrell/Mr. Scott, SLPE. *Id.* at 64-65. Third, the plaintiff argues that the ALJ failed to properly evaluate his credibility. *Id.* at 70-71. Fourth, the plaintiff argues that the ALJ erred in relying on the VE's testimony to determine that there were jobs existing in significant numbers in the national economy that the plaintiff can perform. *Id.* at 65-70.

### 1. A sentence six remand under 42 U.S.C. § 405(g) is inappropriate to consider the new evidence provided to the Court.

The plaintiff argues that remand is appropriate to consider evidence that was not made a part of the record before the ALJ. Docket Entry No. 28-1, at 72. The evidence in question, which has been included as a supplement to the record before the Court, consists of medical records from the plaintiff's treatment at MHC from September 1997 to December 2002. Docket Entry No. 38; (tr. 1654-1715). The parties agree that the plaintiff submitted the MHC records to the SSA before the ALJ issued her decision but that, for an unexplained reason, the MHC records were not included in the record considered by the ALJ.[8] Docket Entry No. 28-1, at 72; Docket Entry No. 34; Docket Entry No. 43, at 15-16. The defendant argues that the omission of the records is harmless error. Docket Entry No. 43, at 15-16.

Newly submitted evidence that is not reviewed by the Commissioner can only be considered with a sentence six remand under 42 U.S.C. § 405(g). The Court can require an ALJ to consider additional evidence on remand only if the plaintiff shows that the evidence is "new" and "material" and provides "good cause" for failing to include the evidence in the record prior to the ALJ's decision. 42 U.S.C. § 405(g). *See also Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477,

---

[8] The plaintiff has submitted an electronic records receipt showing his submission of the records on March 29, 2012. Docket Entry 24-2, at 1.

490-91 (6th Cir. 2006); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). As the Sixth Circuit has explained, "[f]or the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Further, new evidence is "'material' only if there is a reasonable possibility that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence," *Foster*, 279 F.3d at 357 (citing *Sizemore*, 865 F.2d at 711), and "good cause" can be shown "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357 (citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984) (per curiam)).

Initially, the Court notes that this case presents a different scenario than is contemplated by a sentence six remand. This is because the evidence is not "new" inasmuch as the parties agree that the plaintiff submitted the evidence to the SSA before the ALJ's decision. Similarly, the plaintiff should not have to demonstrate "good cause" because it is the SSA's error in omitting the evidence from the record and not his.

Nevertheless, after considering the evidence in question, the Court concludes that the plaintiff is not entitled to a sentence six remand. The Court is not persuaded that the ALJ would have reached a different decision had she considered the evidence from MHC. As the defendant points out, the evidence is remote in time. The plaintiff's amended alleged onset date is December 31, 2010, and the latest evidence from MHC is from December 13, 2002, nearly eight years earlier. Moreover, the treatment notes from MHC are not significantly different from later treatment notes from the

plaintiff's mental health providers at Vine Hill. Although the evidence from MHC documents some extreme behavior during periods of significant anxiety and turmoil, the evidence also documents the plaintiff's frequent decisions not to take medication or attend mental health counseling, often because he was feeling better or could not keep appointments because he was working. In this way, the evidence is not substantially different from later evidence that was considered by the ALJ. For example, the ALJ noted that "[t]he record shows a remote history of treatment for substance abuse, depression, and possible antisocial personality disorder" but that the plaintiff's "[m]oods were generally considered well controlled on medications in 2006 . . . and 2007." (Tr. 19.) The ALJ noted that the plaintiff was working despite his mental impairments, that he had "numerous altercations in the past," and that "a psychological evaluation . . . suggest[ed] significant problems dealing with others." *Id.* In sum, the evidence from MHC is in keeping with the plaintiff's overall mental health picture, and the Court is not convinced that its inclusion would have changed the outcome of the ALJ's decision. Because of the remoteness of the evidence from MHC, as well as its similarity to other evidence in the record, the Court concludes that a sentence six remand for further consideration by the ALJ is not appropriate.

### 2. The ALJ properly assessed the medical opinion evidence.

The plaintiff argues that the ALJ erred when assessing the medical opinions of Dr. Watson and Dr. Terrell/Mr. Scott, SLPE. Docket Entry No. 28-1, at 64-65. The plaintiff contends that the ALJ did not give "good reasons for rejecting the opinions of these medical sources." *Id.*

According to the Regulations, the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 416.927(c). The medical opinion of a treating source[9] is entitled to "controlling weight" if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[10] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If the ALJ does not give a treating source's medical opinion controlling weight, she must weigh the opinion using the factors in 20 C.F.R. § 416.927(c)(2)-(6)[11] and provide "good reasons" for the weight given to the treating

[9] The Regulations define a treating source as "[the plaintiff's] own physician, psychologist, or other acceptable medical source who provides [the plaintiff], or has provided [the plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the plaintiff] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the plaintiff's] medical condition(s)." *Id.*

[10] Effective March 26, 2012, the numbering for the treating physician rule changed, and sections 404.1527(d)(2) and 416.927(d)(2) became sections 404.1527(c)(2) and 416.927(c)(2), respectively. *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

[11] Appropriate factors include:

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

20 C.F.R. § 416.927(c)(2)-(6).

source's opinion. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. § 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[12] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

The plaintiff argues that the ALJ improperly rejected the opinion of Dr. Watson, who performed a consultative examination on February 24, 2010, and opined that the plaintiff could occasionally lift and/or carry ten pounds and stand and/or walk at least two hours and sit about six hours with normal breaks during an eight-hour workday. Docket Entry No. 28-1, at 64-65; (tr. 1390-91).

Dr. Watson is not a treating source because he only performed a single consultative examination. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (finding that a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (finding that a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502).

---

[12] The rationale for the "good reasons" requirement is to provide the plaintiff with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

Consequently, the treating physician rule does not apply, and the ALJ was only required to consider Dr. Watson's opinion in accordance with 20 C.F.R. §§ 404.1527(c) and 416.927(c).

The ALJ thoroughly considered Dr. Watson's findings, noting that the plaintiff had "a positive right straight-leg raising test, decreased sensation to light touch and pinprick in the right leg and decreased back and left shoulder motion, but otherwise full range of motion throughout, normal gait, and full strength." (Tr. 21.) The ALJ indicated that she gave Dr. Watson's opinion that the plaintiff could only perform sedentary work "limited weight," noting that "the objective clinical evidence does not support that degree of limitation." *Id.* The ALJ supported this finding by citing countervailing medical evidence including physical examination findings showing full range of motion, a normal gait, and normal strength. *Id.* The Court concludes that the ALJ gave sufficient consideration to Dr. Watson's opinion.

The plaintiff also argues that the ALJ should have given good reasons for "rejecting" the opinions of Dr. Terrell and Mr. Scott, who performed a consultative psychological examination of the plaintiff in September and October 2010. Docket Entry No. 28-1, at 64-65; (tr. 1485-99). After summarizing the examination findings, the ALJ discussed the examiners' opinion as follows:

> The examiners concluded that the expectation of long-term employment was poor; specifically there were moderate problems with extended concentration and distractability [*sic*], responding to change, and dealing with hazards,[13] as well as marked problems in completing a work day, and dealing with supervisors and coworkers. . . . These opinions have been considered, but must be weighed in conjunction with the evidence of record. The claimant has not received mental health treatment or hospitalization during the period at issue. Further, the record during the period at issue in 2011 and 2012, does not reflect the frequency of ongoing altercation injuries in 2011 and 2012, and the treatment notes do not refer to overt

---

[13] The Court notes that Dr. Terrell and Mr. Scott did not opine that the plaintiff would have moderate problems "dealing with hazards" but rather opined that he would not be significantly limited in this area. (Tr. 1499.)

anti-social behavior during treatment or significantly abnormal mental status findings. Mood and affect were considered appropriate in 2012. . . . Additionally, the claimant was responsive, polite and calm at the hearing, and his testimony indicated that he was able to get along with a work partner, solicit business at an auto parts store and relate to some extent to customers in operation of his car repair business, even without ongoing mental health care. The undersigned concludes that the claimant has some degree of mental impairment in performing tasks and dealing with others, but not to a disabling extent.

(Tr. 19; internal citations omitted.)

As is the case with Dr. Watson, Dr. Terrell and Mr. Scott are not treating sources because they only saw the plaintiff on one occasion for a consultative examination. *See Abney*, 2008 WL 2074011, at *11. Consequently, the ALJ was not required to give their opinion controlling weight or provide "good reasons" for the weight that she afforded. Nevertheless, the ALJ provided a very detailed analysis demonstrating how their opinion was inconsistent with the plaintiff's symptoms, treatment history, and testimony. The ALJ appropriately considered the opinion of the consultative psychological examiners and did not err in assessing the opinion evidence.

### 3. The ALJ properly evaluated the plaintiff's subjective complaints.

The plaintiff argues that the ALJ's credibility finding is not supported by substantial evidence, violates Social Security Ruling 96-7p, and is merely "boilerplate" and "conclusory." Docket Entry No. 28-1, at 70-71.

An ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations

omitted).  However, "[i]f the ALJ rejects the claimant's complaints as incredible, [s]he must clearly state [her] reason for doing so."  *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ.  1996 WL 374186, at *4.  In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence.  *Id.* at *5.  Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect."  *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011).  The ALJ must explain her credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight.  Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain.  *See* 20 C.F.R. §§ 404.1529; 416.929; *Felisky*, 35 F.3d at 1037.  While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there.  The Sixth Circuit, in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[14]  The *Duncan* test has two prongs.  The first prong is whether there is objective medical evidence of an underlying medical condition.  *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853).  The

---

[14] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The ALJ satisfied the first prong of the *Duncan* test when she concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (Tr. 18.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[15]

---

[15] The seven factors include: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

The plaintiff contends that the following finding by the ALJ is merely "boilerplate" and "conclusory:"

> . . . after careful consideration of the evidence, the undersigned finds that the claimant's current medically determinable impairment could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

Docket Entry No. 28-1, at 70-71; (tr. 18). The Court would agree with the plaintiff if this were the entirety of the ALJ's analysis of the plaintiff's subjective complaints. However, the plaintiff's argument ignores entirely the portion of the ALJ's decision in which she explains her reasons for the above finding.

As set out in significant detail, the ALJ explained that she found the plaintiff's complaints of disabling symptoms to not be entirely credible because they were inconsistent with other evidence of record, including the objective medical evidence, the plaintiff's treatment history, medical opinions, the plaintiff's testimony, and his daily activities and hearing demeanor. (Tr. 18-22.) For example, the ALJ noted physical examination findings showing generally full range of motion, a normal gait, and normal strength. (Tr. 21.) The ALJ also noted that the plaintiff's mental health symptoms were frequently noted to be well controlled on medication and that treatment notes failed to document significant anti-social behavior during the relevant period of alleged disability. (Tr. 18-20.) The ALJ noted that the non-examining DDS medical consultants opined that the plaintiff was capable of working. (Tr. 21.) Finally, the ALJ observed that the plaintiff was "responsive, polite and calm" at the hearing and had testified that he was able to work with a partner, solicit business, and relate to customers in the operation of his part-time car repair business, even without ongoing

mental health care. (Tr. 19.) The ALJ's discussion of the plaintiff's credibility was not "boilerplate" or "conclusory" and was in fact a detailed analysis focusing on the appropriate factors.

The plaintiff also argues that the ALJ erroneously employed "a version of the 'sit and squirm' test" in which his demeanor at the hearing was unduly held against him. Docket Entry No. 28-1, at 65. In the Court's view, the plaintiff overstates the emphasis that the ALJ placed on his demeanor at the hearing. While the ALJ did note that the plaintiff was "responsive, polite and calm" at the hearing, this was simply one of several factors that the ALJ relied upon in assessing the credibility of the plaintiff's complaints. *See Johnson v. Comm'r of Soc. Sec.*, 210 F.3d 372, 2000 WL 332059, at *4 (6th Cir. Mar. 22, 2000) (In concluding that the ALJ "did not subject [the] [p]laintiff to a 'sit/squirm ordeal,'" the Court noted that "[t]he ALJ's personal observation was one of several factors, not the sole factor, in determining that [the] [p]laintiff's pain was not disabling.").

The ALJ set forth a detailed analysis evaluating several factors in 20 C.F.R. § 404.1529(c)(3) and concluding that the plaintiff's subjective complaints of pain were not disabling. The ALJ's assessment complies with *Duncan*, Social Security Ruling 96-7p, and 20 C.F.R. § 404.1529.


### 4. The ALJ's conclusion that there are a significant number of jobs that the plaintiff can perform is not supported by substantial evidence.

The plaintiff argues that the ALJ erred by relying on the VE's testimony to determine that there are jobs existing in significant numbers in the national economy that the plaintiff can perform. Docket Entry No. 28-1, at 65-70. The plaintiff contends that the VE's testimony does not support the ALJ's conclusion. *Id.*

At step five, the Commissioner bears the burden of demonstrating that there are a significant number of jobs in the national economy that the plaintiff is capable of performing. *See* 20 C.F.R. §§ 404.1512(f); 404.1560(c)(2). *See also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). The Regulations allow the ALJ to rely on the testimony of a VE at step five to determine whether the plaintiff is able to perform any work given his RFC and vocational factors. 20 C.F.R. §§ 404.1560(c)(2); 404.1566(e). *See also* Soc. Sec. Rul. 00-4P, 2000 WL 1898704. Additionally, the SSA takes administrative notice of "reliable job information" available from various publications, including the DOT. 20 C.F.R. § 404.1566(d); Soc. Sec. Rul. 00-4P, 2000 WL 1898704, at *2. Whether a "significant" number of jobs exists is a "fact-specific inquiry, guided by common sense," and there is no "magic number." *Cunningham v. Astrue*, 360 Fed. Appx. 606, 615 (6th Cir. Jan. 5, 2010) (quoting *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)).

Here, the ALJ found at step five that, based upon the VE's testimony, a significant number of jobs exist in the national or regional economy that the plaintiff can perform. (Tr. 22-24.) Specifically, the ALJ referenced the VE's testimony that the plaintiff can perform the requirements of the following representative occupations: (1) "Final Assembler of Optical Goods, DOT number 713.687-018 . . . with there being 30,500 jobs available in the national economy;" (2) "Film Can Mounter, DOT number 967.684-086 . . . with there being 20,180 jobs available in the national economy;"[16] and (3) "Eye Doppler [*sic*] Assembler, DOT number 739.687-086 . . . with there being 23,955 jobs in the national economy." (Tr. 23.)

The ALJ explained her decision to rely on the VE's testimony as follows:

---

[16] As discussed in more detail below, the VE actually identified the job of film hand mounter, DOT code 976.684-018. (Tr. 112-13.)

There was much discussion at the hearing of the basis for the vocational expert's numbers and his reliance on the OASIS program in this regard. The claimant's representative challenged the numbers presented by the expert with an Occupational Employment Report on Apparel Manufacturing from the Occupational Employment Service . . . . The vocational expert discussed reasons for questioning reliance on the information provided by the OES report in the current situation, and testified that the OASIS program he used was considered reliable by vocational experts. He acknowledged that the numbers he cited for the photo mounter job may be reduced from those present in 2009, but stated that the jobs were still being done. He also testified that he considered the job descriptions accurate as set forth in the DOT. The undersigned concludes that numbers initially presented by the vocational expert may be reduced, but not substantially, and finds no reason to reject the vocational testimony, concluding that in its entirety it supports a significant number of jobs that exist in the national or regional economy that the claimant could perform.

(Tr. 23-24.)

The gist of the plaintiff's argument is that the VE testified that he did not know how many jobs existed in the economy for the three DOT occupations that he identified and that, consequently, the ALJ should not have relied on the VE's testimony at step five. Docket Entry No. 48, at 1-7. After reviewing the VE's testimony and the ALJ's explanation for relying on the VE's testimony, the Court agrees with the plaintiff that the ALJ's decision at step five is not supported by substantial evidence.

The VE's testimony during a rigorous cross examination revealed several reasons for questioning the reliability of his opinion that there are a significant number of jobs that the plaintiff can perform. The VE testified that he obtained the number of jobs available in the national economy for the three DOT occupations from a program called Oasis, and he testified that Oasis bases its numbers on the Occupational Employment Survey ("OES"). (Tr. 60, 63, 66-68.) The VE had never seen an OES survey form before the hearing (tr. 74), and he testified that he did not look at OES statistics himself and did not know the methods by which Oasis formulates its data. (Tr. 63, 65.)

He testified that the data he relied upon was from May 2009 and that the number of available jobs could have decreased since then.  (Tr. 73.)

The VE testified that the OES classifies jobs according to the Standard Occupational Classification System ("SOC") and not according to DOT codes.  (Tr. 60-62.)  However, as the VE acknowledged, SOC codes do not correspond directly to jobs in the DOT and instead encompass broader occupational categories than the specific jobs identified in the DOT.  (Tr. 76-78.)  The VE acknowledged, for example, that the DOT code for film hand mounter is "cross logged" to a broader SOC classification for hand cutters and trimmers.  (Tr. 62-64.)  However, the SOC description for hand cutters and trimmers includes a variety of other types of jobs, including cutting and trimming carpet, fabric, stone, glass, and rubber, and in fact does not even specifically refer to cutting film.  (Tr. 64, 447.)  Consequently, based on the VE's testimony, he is not able to determine how many film hand mounter jobs are included within the broader SOC category of hand cutters and trimmers.  (Tr. 76-78.)  When pressed, the VE responded that "nobody knows what that number is" and admitted that this was true of all the jobs that he identified.  (Tr. 78.)

Other courts have considered the reliability of the statistical data upon which a vocational expert based his or her opinion that a plaintiff was able to perform specific jobs existing in the national economy.  *See generally Herrmann v. Colvin*, 772 F.3d 1110, 1112-14 (7th Cir. Dec. 4, 2014); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. Sept. 4, 2014); *Guiton v. Colvin*, 546 Fed. Appx. 137, 141-45 (4th Cir. Nov. 7, 2013); *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 446-47 (2d Cir. Jun. 29, 2012); *Liskowitz v. Astrue*, 559 F.3d 736, 742-744 (7th Cir. 2009); *Petry v. Colvin*, 2013 WL 3245330, at *12-13 (N.D. Ohio Jun. 26, 2013); *Woodruff v. Astrue*, 2013 WL 821336, at *6-7 (N.D. Ohio Mar. 5, 2013).  In particular, the problem of matching DOT codes to the broader

categories described by SOC codes has proven vexing. *See Guiton*, 546 Fed. Appx. at 143-45 (Davis, J., concurring). Courts have nevertheless been reluctant to hold that a vocational expert must have technical knowledge regarding the methods and raw statistics supporting their opinions. *See Guiton*, 546 Fed. Appx. at 141-43. *See also Liskowitz*, 559 F.3d at 743 ("The witness was testifying as a vocational expert, not as a census taker or statistician. Indeed even if the VE had happened to know something about the statistical basis for her testimony, she arguably still would not be in a position to fully vindicate her conclusions.").

However, in order for a court to perform meaningful review of the Commissioner's decision, there must be some basis in the record for the number of jobs that the VE testified the plaintiff can perform. *See Herrmann*, 772 F.3d at 1113-14 ("We do not know how the vocational expert in this case calculated the numbers to which he testified. Nothing in the record enables us to verify those numbers, which the [ALJ] accepted."). The VE's testimony in this case leaves the impression that he has no idea how many final assembler of optical goods, film hand mounter, and eye-dropper assembler jobs are in the national economy. By the end of his testimony, the VE conceded that the original job numbers that he had provided were not correct and that "only some percentage of that number" would include the specific jobs that he had identified. (Tr. 78.) This is unacceptably vague. There is no meaningful way to determine the number of jobs that the VE concluded the plaintiff can perform in order to determine whether it is a significant number.

Although the VE testified that Oasis is considered authoritative and reliable by vocational experts (tr. 73), his use of Oasis and explanatory testimony in this case does not lead to any identifiable number of jobs. Additionally, while an ALJ may rely on a VE's experience and expertise, the VE's testimony that once, four or five years ago, he observed a film lab and that he is

aware of an eyeglass factory in Florida (tr. 65-66, 73-74) speaks very little to the question of how many of these jobs exist in the national economy. The defendant argues that these jobs still exist and cites cases in which a denial of benefits has been upheld based on a plaintiff's ability to perform these very jobs. Docket Entry No. 43, at 14. The Court has no reason to dispute whether these jobs exist in a general sense and does not find them to be outdated or obsolete. However, on the record presented to the Court, the VE's testimony does not prove that, at the time the plaintiff sought disability, these jobs existed in significant numbers in the national economy.

The problems with the VE's testimony are compounded by the ALJ's explanation for using the testimony to support her step-five finding. First, the Court notes that one of the jobs that the ALJ found the plaintiff can perform, Film *Can* Mounter, DOT code 967.684-086, is a different job than the one the VE actually testified that the plaintiff can perform, Film *Hand* Mounter, DOT code 976.684-018, and does not even correspond to an entry in the DOT.[17] (Tr. 23, 112-13.) (Emphasis added). Second, the Court questions the ALJ's assessment that the VE "discussed reasons for questioning reliance on the information provided by the OES report in the current situation." (Tr. 23.) This shows a fundamental misunderstanding of the VE's testimony. The VE specifically acknowledged that the OES is the source of the data for the Oasis program that he used to determine the number of available jobs. (Tr. 60, 63-64, 66.) The VE did not question the OES data so much

_____

[17] For that matter, "eye doppler assembler" is not a job either; however, the ALJ at least cited the same DOT code that the VE did. (Tr. 23, 113.) The ALJ meant to refer to "eye-dropper assembler," one who "[s]lips rubber bulbs over ends of glass tubes to form eye droppers." DOT, at 772. The plaintiff contends that the job of eye-dropper assembler is inappropriate because it requires constant fingering and handling and the ALJ found that he could perform only frequent fingering and handling with his dominant extremity. Docket Entry No. 28-1, at 65. Because the Court finds that the ALJ's step-five decision is not supported by substantial evidence, it is not necessary for the Court to address this issue.

as acknowledge that, due to the sorting of that data according to SOC codes, he could no longer identify the number of jobs available in the specific DOT occupations that he identified. Moreover, to the extent that the VE did question reliance on the OES data as the ALJ suggests, this would undermine the foundation of his opinion because it is based on OES data in the first place.

Finally, and most importantly, the ALJ's conclusion that the "numbers [of jobs] initially presented by the vocational expert may be reduced, but not substantially," in order to find that there are still a significant number of jobs for the plaintiff, is illogical, vague, and arbitrary. The reason that the ALJ decided to reduce the number of jobs is because the VE's initial testimony was proven to be incorrect. In other words, the ALJ implicitly acknowledged that the VE's testimony that there were 30,500 final assembler of optical goods jobs, 20,180 film hand mounter jobs, and 23,955 eye-dropper assembler jobs was unreliable. From there, the ALJ decided to reduce the number of jobs by some unspecified number to some unspecified amount. Such imprecision cannot be the basis for a finding that substantial evidence supports the ALJ's decision. There is simply no way to determine whether the number of jobs that are still available after this fuzzy math constitutes a significant number.

Consequently, the Court concludes that the ALJ's decision is not supported by substantial evidence at step five. Because the question of whether there are a significant number of jobs available in the national economy that the plaintiff can perform is a factual question, remand for further consideration is appropriate. *See Malone v. Astrue*, 2012 WL 1078932, at *6-7 (M.D. Tenn. Mar. 30, 2012) (Nixon, J.) (citing *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171 (6th Cir. 1994). On remand, the ALJ should determine whether there are a significant number of jobs

in the national economy that the plaintiff can perform.  If necessary, the ALJ should obtain additional VE testimony to provide an evidentiary basis for her decision.

## IV.  RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 28) be GRANTED to the extent that the case should be REMANDED for additional consideration.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of  the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,


JULIET GRIFFIN
United States Magistrate Judge